| WOODARD, J.,
dissenting.
I respectfully dissent from the majority’s opinion.
Ms. King’s heirs provided evidence, the inferences of which indicate that, more likely than not, it was her separate funds, not his, which were responsible for the property’s purchase. As our supreme court has instructed, “[Fjactual inferences reasonably drawn from the evidence must *1240 be construed in favor of the party opposing the motion [for summary judgment], and all doubt must be resolved in the opponent’s favor.” [1] (Emphasis added.) Thus, the inferences from Ms. King’s evidence should preclude summary judgment for Mr. Fairrow’s heirs. However, instead, the majority opinion ignores those inferences and affirms the judgment, and does so, solely, on the basis of a rebutted presumption; namely, because the two were not married, after all, Mr. Fairrow’s signature as vendee on the deed in 1945, leads to the presumption that he was the property’s only owner. They stop here. IgHowever, the material inferences from Ms. King’s evidence adequately rebuts this presumption.
Most telling was Ms. King’s direct evidence, which Mr. Williams’ affidavit provided, that he had personal knowledge that Laura King was the one who went to sign the paperwork on the property (in question) each year, until her grandson, James E. Marves became old enough, at which time, he began signing for her.
Also important is the direct evidence that $1,100.00 of the $1,500.00 purchase price was paid in cash, $400.00 being financed, and that, only, she and her children, not Mr. Fairrow, were employed at the time. Mr. Joseph W. Marves’ stated in his deposition that he had personal knowledge that she used to work the fields on the subject property. Ms. Bobbie Nell Phillips stated that she had personal knowledge that Laura King generated income by working outside the home, and that Camp Claiborne Army Camp employed her. Finally, Mr. Boyd Williams stated that, in 1941, he transported her and her children to and from Army Camp Claiborne, where they worked. Furthermore, Mr. Williams noted that he knew that the property was purchased in 1945 during a time when only Laura King and her children were working and that Henry Fairrow did not work until 1949 or 1950 when he began working for the railroad.
On the other hand, Mr. Fairrow’s heirs rested, completely, on the one presumption in the act of sale and mortgage and their evidence of a legal impediment to Mr. Fa-irrow’s and Ms. King’s marriage. His heirs presented no countervailing evidence of his contributions towards the purchase price nor did they satisfy their shifted burden[2] to provide any evidence that he had the income means from a source, other than employment, to make contributions.
Furthermore, we do not know from the record whether he knew that there was a legal impediment to their “marriage.” All we know is that the two were living together and holding themselves out as husband and wife. Both were involved in cohabitation. Thus, we should not “punish” Ms. King’s heirs and reward Mr. Fairrow’s by denying her rightful and, apparently, well earned interest in this property because she “lived in sin,” especially when we have no reason to believe that his behavior was no different from hers.
| «Indeed, the most reasonable factual inferences to draw from all of the evidence in this record is that Mr. Fairrow, not Ms. King, is the one who obtained an interest in the property because of the concubinage — that it was he who enjoyed the fruits of Ms. King’s and her children’s labor — and that it was her separate funds which actually purchased the property.
Additionally, his recital of marriage in the deed, while incorrect, is useful for illuminating his intentions concerning the *1241 property. The deed is a contract. The main goal in contract interpretation is to determine the intent of the parties.[3] In 1945, when the purchase of this property was made, there were legal and practical considerations which weighed against a “wife” signing a deed as co-vendee and would explain the instant situation. For example, the recital of marriage in the deed gave rise to a presumption that Ms. King owned a one-half undivided interest in the property,[4] even if she did not sign it.
Additionally, for Ms. King to have signed the document as a co-vendee would have been pointless, as it would have given her no additional rights over the property.[5] Even purchasing the property in her own name, instead of in Mr. Fan-row’s, would have given her no additional rights in the property.[6] Although, the Plaintiffs have proved that the couple was not, in fact, legally married, this does not eradicate the parties’ intent, regarding ownership of this immovable property, which is expressly reflected in the act of sale. The two were holding themselves out in the community as a married couple who, obviously, wanted to share rights to this property.
To understand this couple’s dilemma and thinking in 1945, we must understand the legal backdrop and societal mentality of the time. At that time, La.Civ.Code art. 2404 established the presumption that property acquired in the name of only one of the parties during the marriage was community property; the husband was considered to be the “Head and Master” of the community, having the exclusive right to manage, alienate, and encumber the property regardless of whether his name, her name, or both |4names appeared in the act of sale.[7] Further, given Mr. Fairrow’s declaration of marriage, if he had intended to own the property as his separate property, he was required to make a “double declaration,” stating that he intended to own the property as his separate property and that he had acquired it with his separate funds.[8] Thus, his failure to do so gives rise to a presumption that he did not intend for the property to be his separate property and that he did not use his separate funds to purchase it.[9] Indeed, the evidence, which Ms. Kings’ heirs provided, also, factually supports these conclusions.
Further, given the prevailing law and societal notions at that point in history, we must acknowledge the practical reasons that may have prevented Ms. King from purchasing the property in her own name. If she had purchased the property in her own name, it would not have been sufficient to put third parties on notice, without further investigation, that both of them owned the property; whereas, Mr. Fair- *1242 row’s purchase of the property, absent a double declaration, automatically, put third parties on notice that they both had an ownership interest.[10]
Also, the purchase involved an extension of credit for $400.00. If Ms. King’s name had been listed as vendee, a third party, believing that she was married to Mr. Fa-irrow, would not likely have extended this credit to her, knowing that Mr. Fairrow had the power to invalidate the sale; whereas, that would not have been a concern if |fiMr. Fairrow was listed as the vendee because Ms. King had no power to invalidate the sale.[11]
Thus, it appears from the evidence that the simple fact that Mr. Fan-row's name, alone, appears as vendee on the deed is more likely a result of the prevailing mentality in 1945 associated with the repealed “Head and Master” policy than it is a foregone conclusion that he, alone, paid for and owned the property.
I submit that to discover the true ownership of this property and to do justice, we must look deeper than to the rebutted presumption, the majority relies on, and that inquiry requires a trial, rendering summary judgment inappropriate.

. Willis v. Medders, 00-2507 (La. 12/8/00), 775 So.2d 1049.

. La.Code Civ.P. art. 966(C)(2).

. La.Civ.Code art.2045.

. See La.Civ.Code art. 2404 (1870), repealed by Act 627 (1978).

. See Id.; See also W.K. Investment Co. v. Tyler, 303 So.2d 777 (La.App. 1 Cir. 1974), writ denied, 305 So.2d 543 (La.1975).

. La.Civ.Code art. 2404 (1870), repealed by Act 627 (1978).

. Id.

. La.Civ.Code art. 2334 (1870), repealed by Act 627 (1978).

.Nathan, Notes-Community Property, Sale and Resale of Immovable-Necessity of Double Declaration, 34 Tul.L.Rev. 385 (1960). See also Smith v. Smith, 230 La. 509, 89 So.2d 55 (1956); Succession of Hemenway, 228 La. 572, 83 So.2d 377 (1955); Borne v. Calmes, 284 So.2d 815 (La.App. 4 Cir.1973); Succession of Pittman, 282 So.2d 799 (La.App. 1 Cir.1973); Boulet v. Fruge, 221 So.2d 602 (La.App. 3 Cir. 1969); LaFleur v. Guillory, 181 So.2d 323 (La.App. 3 Cir. 1965).

. See e.g. Sharp v. Zeller, 110 La. 61, 34 So. 129 (1902); Succession of Burke, 107 La. 82, 31 So. 391 (1902); Hero v. Block, 44 La.Ann. 1032, 11 So. 821 (1892); Huie, Separate Ownership of Specific Property, 26 Tul.L.Rev. 427 (1952); Wilcox, Civil Law-Comments-The Marital Status Of Property Purchased With Separate Funds, 9 Tul.L.Rev. 107.

. La.Civ.Code art. 2404 (1870), repealed by Act 627 (1978). See also Wilcox, supra, n. 26.